AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

## for the

**LODGED**
CLERK, U.S. DISTRICT COURT

5/26/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAM _____ DEPUTY

### Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

May 26, 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

United States of America

v.

MARIA DE LA LUZ GARCIA-GOMEZ and
JONATHAN ALEXIS MERCADO,

Defendants

Case No.    2:22-mj-02096-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of April 20, 2022 in the county of Los Angeles in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Carlos Duran*
_____
*Complainant's signature*

Carlos Duran, DEA Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    May 26, 2022

_____
*Judge's signature*

City and state:    Los Angeles, California

Hon. Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Elia Herrera (x2024)

## AFFIDAVIT

I, Carlos Duran, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of a criminal complaint and arrest warrants against Maria De La Luz GARCIA-GOMEZ ("GARCIA-GOMEZ") and Jonathan Alexis MERCADO ("MERCADO") for a violation of 21 U.S.C. § 841(a)(1): distribution of a controlled substance.

2.     This affidavit is also made in support of an application for a warrant to search Storage Unit 777a at Extra Space Storage, a storage facility located at 157 E Stanley St, Compton, CA 90220 (the "SUBJECT PREMISES"), as described more fully in Attachment A.

3.     The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances and distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless

specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent (SA) with the United States Drug
Enforcement Administration ("DEA") and have been so employed
since November 2020.  I am currently assigned to the Los Angeles
Field Division.  As a DEA SA, I have received extensive training
regarding federal law enforcement, including federal firearms,
and narcotics offenses.  I also completed formal training at the
DEA Training Academy in Quantico, Virginia, where I received
specialized training in various surveillance and investigative
techniques related to organized crime and narcotics trafficking,
among other things.  Based on my training and experience, I am
familiar with the methods of operation of drug traffickers,
including the importation, exportation, distribution,
transportation, and storage of controlled substances, as well as
the collection of money proceeds of drug trafficking and methods
of money laundering used to conceal the nature of the proceeds.

## III. SUMMARY OF PROBABLE CAUSE

6.    In February 2022, a fentanyl and methamphetamine
broker provided a Drug Enforcement Administration Confidential
Source (CS1)[1] with the contact information of a fentanyl and

---

[1] CS1 has been working with DEA since 2006 and has worked
with Enforcement Group 4 of the Los Angeles Field Division since
2018.  The CS provides information and services supporting DEA
investigations throughout the United States and has testified in
multiple federal trials.  The CS assists DEA for financial
*(footnote cont'd on next page)*

methamphetamine supplier in the California area.  That supplier was later determined to be GARCIA-GOMEZ.  Over the next few months, CS1 and GARCIA-GOMEZ negotiated the sale of fentanyl and methamphetamine.  CS1 told GARCIA-GOMEZ that a family member, which in reality was a DEA Undercover Officer (the "UC") and another individual, who was a DEA Confidential Source ("CS2")[2], would meet GARCIA-GOMEZ to complete the transactions.

7.    On February 9, 2022, GARCIA-GOMEZ met with the UC and sold the UC 1,000 fentanyl pills and two pounds of methamphetamine for $4,000.  On April 20, 2022, GARCIA-GOMEZ met with CS2 and sold CS2 2,000 fentanyl pills for $4,000.  A Hispanic male, who was later identified as MERCADO, hand-delivered the suspected fentanyl pills to CS2.  On May 5, 2022, GARCIA-GOMEZ met with CS2 and sold CS2 3,000 fentanyl pills for $6,000.

8.    On May 25, 2022, GARCIA-GOMEZ arranged to meet CS2 to sell CS2 50,000 fentanyl pills.  Before the meeting, GARCIA-GOMEZ and MERCADO drove to a storage facility where GARCIA-GOMEZ rents a storage unit (the SUBJECT PREMISES), and attempted to access the unit.  An employee at the storage facility did not allow

---

benefit and has not yet been paid for his/her support in this investigation.  The CS has earned over $2,207,853.22 in exchange for all work done on behalf of the DEA.  The CS has several arrests: (1) a 1996 arrest for carrying a concealed weapon and for carrying a loaded firearm in a public place; (2) a 2004 arrest for controlled substance related offenses; and (3) a 2007 arrest for grand theft.  The CS has a 2008 misdemeanor conviction for grand theft.  The information CS1 has given to law enforcement officers has thus far proved to be truthful and reliable.

[2] CS2 has been working with DEA since 2011 and has worked with EG4 since 2018.  CS2 assists DEA for financial benefit. CS2 has no known criminal history.

GARCIA-GOMEZ to access the SUBJECT PREMISES because she had not paid rent. GARCIA-GOMEZ told the employee that she would pay more money for them to open the SUBJECT PREMISES, but the employee refused. The storage unit employee later informed the DEA that the employee had seen empty acetone bottles near GARCIA-GOMEZ's storage unit. Based on my training and experience, acetone is used in the making of crystal methamphetamine.

9.      After GARCIA-GOMEZ and MERCADO left the storage facility, they parked near the agreed-upon meet location. MERCADO exited his car, removed a bookbag from GARCIA-GOMEZ's car, and placed it in his car. GARCIA-GOMEZ then met with CS2 at the agreed-upon and told CS2 that she could bring out 10,000 fentanyl pills at a time. GARCIA-GOMEZ then drove back to where MERCADO's car was located. Law enforcement officers then detained GARCIA-GOMEZ, and saw that MERCADO had left the scene. Law enforcement officers searched MERCADO's car, saw the bookbag on the passenger side floor, and saw that the bookbag contained a large quantity of suspected fentanyl pills.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.     Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.      Broker Informs CS1 that GARCIA-GOMEZ Distributes Fentanyl and Methamphetamine**

11.     In February 2022, I received information from CS1 regarding a conversation between CS1 and a drug broker in Mexico. CS1 explained that during recent telephone conversations with the

broker via WhatsApp, the two had discussed a fentanyl and methamphetamine deal. The broker then sent CS1 a phone number, 559-330-5299 (the "5299 number"), which was subsequently identified as belonging to Maria GARCIA-GOMEZ, as discussed below.

**B.    GARCIA-GOMEZ Arranges to Sell CS1 1,000 Fentanyl Pills and Two Pounds of Methamphetamine on February 9, 2022**

12.    On February 7, 2022, CS1 placed a recorded phone call to GARCIA-GOMEZ at the 5299 number. The conversation was in Spanish. I am a fluent Spanish speaker and reviewed the audio of the call. GARCIA-GOMEZ asked CS1 if he/she wanted 'aguas'. CS1 confirmed and asked if GARCIA-GOMEZ also had 'rueditas' available. GARCIA-GOMEZ stated she had 1,000 pills available. GARCIA-GOMEZ stated an unidentified male ordered 10,000 pills but she sold him only 8,000 pills. She also stated that she sold another unidentified male 1,000 pills, leaving her with 1,000 pills. Based on my training and experience, 'aguas' is slang for methamphetamine and 'rueditas' is slang for fentanyl pills.

13.    On February 8, 2022, CS1 placed a recorded phone call to GARCIA-GOMEZ at the 5299 number. The conversation was in Spanish. I am a fluent Spanish speaker and reviewed the audio of the call. CS1 and GARCIA-GOMEZ confirmed that the deal was going to take place on February 9, 2022 4504 E. 3rd Street in Los Angeles, CA at approximately 1:00 p.m. CS1 informed GARCIA-GOMEZ that CS1's sister-in-law was going to arrive at the deal location at approximately 1:00 pm. CS1 told GARCIA-GOMEZ that he/she would be purchasing two 'aguas' and 1,000 'rueditas' for $4,000.

Based on my training and experience, two 'aguas' refers to two pounds of methamphetamine and 1,000 'rueditas' refers to 1,000 fentanyl pills.

### C.   February 9, 2022: GARCIA-GOMEZ Sells the UC 1,000 Fentanyl Pills and Two Pounds of Methamphetamine for $4,000

14.   Based on my participation in the investigation, review of the audio/video recording, and conversations with the UC, I know the following:

a.   On February 9, 2022, at approximately 12:00 p.m., the UC, along with DEA Special Agents and Fullerton Police Detectives ("FPD") met at a neutral location, before traveling to 4504 E. 3rd Street in Los Angeles, CA.  The UC was given $4,000 and equipped with an audio recording and transmitting device.  Driving a white BMW, the UC followed SA LaShay Thomas and myself to 4504 E. 3rd Street in Los Angeles, the agreed-upon meet location.

b.   At approximately 1:10 p.m., the UC arrived, parked in the south side of the lot, and placed a call to GARCIA-GOMEZ at the 5299 number.  A Spanish-speaking female answered the phone (later identified as GARCIA-GOMEZ).  I was listening to the recording device and was parked near GARCIA-GOMEZ.  The UC informed the female that the UC had arrived at the location.  The UC also described her location in the parking lot.  The female insisted that the UC come to where she was parked in east side of the parking lot.  The female stated she was in a black Honda Civic.  The UC left her vehicle, on foot, and walked towards a black Honda Civic (the "Honda"), bearing

California registration 8UJA923.  The UC acknowledged the Hispanic female, 45-50 years old, in the driver's seat.  Upon making contact, the female insisted that the UC sit in the Honda.  The UC refused.  The female asked the UC to move the UC's vehicle next to the Honda.  The UC walked back to her vehicle and drove it towards the east side of the parking lot, finally parking next to the Honda.  The UC observed a black Mercedes attempting to reverse park in the empty spot next to hers.

c.   The UC exited her vehicle on the driver's side and approached the driver's side of the Honda.  The female rolled down her window completely, and the UC could see the female had her phone on her lap, and was talking to someone.  The individual was directing the female to provide the UC with the narcotics.  The female again requested that the UC enter her vehicle.  The UC, again, refused.  The female stated she wanted to count the money.  The UC asked if she had the pills.  The female initially pulled down the center sunglass visor, but then went to the center console and pulled a white Styrofoam drink cup, with a red straw, and removed the plastic cover to reveal to the UC a plastic bag containing round blue pills.  The UC took the cup and handed the female the $4,000 through the driver-side window.  The female counted the money.

d.   The female exited the vehicle and explained to the UC she was waiting on "a guy" to bring the other part.  The female spoke on the phone with someone who informed her that he would be there shortly.

e.    At approximately 1:25 p.m., a blue, Chevy Tahoe drove through the lot, driven by a Hispanic male who made eye contact with the UC.  The Tahoe left the parking lot and parked on McBride Avenue.  The female told the UC to wait by her car, and the UC watched the female walk to the passenger side of the Tahoe and return to where their cars were parked with a plastic shopping bag.  The UC opened the passenger door of her BMW, and the female placed the plastic bag on the seat, opened the bag to show the UC the bag contained two plastic bags containing crystalized shards, appearing to be methamphetamine.  The UC nodded that she accepted the contents.  The female left the bag on the passenger seat.  The UC thanked the female, and entered her vehicle on the driver's side.

f.    At approximately 1:25 p.m., the UC left the parking lot, and parked on the south side of the parking lot before SA Thomas and I followed her to the neutral location. The UC handed me the styrofoam cup and bag containing the suspected fentanyl and methamphetamine.

15.   A short time later, FPD informed me and SA Thomas that GARCIA-GOMEZ parked next to a black Mercedes Benz.  FPD took a picture of the subject GARCIA-GOMEZ met with, who was later identified as MERCADO.

**D.    Identification of GARCIA-GOMEZ**

16.   On February 11, 2022, I ran the 5299 number and address 7903 Elm Ave #40, Rancho Cucamonga, CA 91730 (which is the address of a location we had previously seen her arrive at)

in publicly accessible applications in order to identify the
female who sold the UC the fentanyl and methamphetamine.

17.   The address was tied to multiple subjects, including a
female by the name of Maria GARCIA-GOMEZ with date of birth
12/10/1975.  I searched California DMV records for the license
plate number of the Honda that the female drove to the deal with
the UC, and saw that the Honda was registered to GARCIA-GOMEZ.

18.   I conducted basic Internet searches for GARCIA-GOMEZ
and found a female by the name of Maria De La Luz GARCIA-GOMEZ,
with a date of birth of 12/1975.  I reviewed a California
Driver's License for GARCIA-GOMEZ, and showed the driver's
license and photo to the UC.  The UC confirmed that the female
pictured on the driver's license was the female who sold her the
drugs.

**E.   April 20, 2022: GARCIA-GOMEZ and MERCADO Sell CS2
2,000 fentanyl pills for $4,000**

19.   On April 7, 2022, at the direction of myself and SA
Thomas and on a recorded line, CS1 was in telephone conversations
with GARCIA-GOMEZ at the 5299 number.  GARCIA-GOMEZ and
CS1 negotiated another transaction for 2,000 fentanyl pills in
exchange for $4,000 to take place on April 20, 2022.  CS1
informed GARCIA-GOMEZ that an associate, CS2, would meet GARCIA-
GOMEZ to conduct the transaction.

20.   On April 20, 2022, SAs Thomas and Incandela met with
CS2, at a neutral location.  CS2 was outfitted with an
audio/video transmitter/recorder device, and shortly thereafter

was escorted to the parking lot of a Vons grocery store located at 1342 Alvarado Street, Los Angeles, CA 90026.

21.  Prior to CS2 arriving to Vons grocery store, law enforcement officers set up surveillance in and around the parking lot.

22.  At approximately 12:00 p.m., CS2 arrived at the Vons grocery store and parked along the east side of the parking lot against a fence line.

23.  At approximately 12:10 p.m. on a recorded line, CS1 notified GARCIA-GOMEZ that CS2 had arrived and was waiting on her.  GARCIA-GOMEZ told CS1 that she was there.

24.  At approximately 12:35 p.m. a gray Honda Accord bearing license plate 7YSX424, registered to an address in Los Angeles, parked adjacent to CS2 on the passenger side of CS2's vehicle.  Shortly thereafter, a gray Mercedes parked on the driver's side of CS2's vehicle.  The Mercedes backed into the parking spot and had no front license plate.  The driver of the Honda Accord and the driver of the Mercedes remained inside of their respective vehicles.

25.  At approximately 12:37 p.m. agents observed CS2 exit the driver's seat of his/her vehicle and stand between his/her vehicle and the passenger side door of the Mercedes.  GARCIA-GOMEZ remained in the driver's seat of the gray Mercedes as she was conversing through the passenger window to CS2 and talking on her cellular phone.  CS2 stated "you expecting me?" and GARCIA-GOMEZ replied "yeah everything is fine."  She informed CS2 that an individual in the jeep had the pills.  CS2 asked "who

should I pay?" and GARCIA-GOMEZ stated "give the money to me."
CS2 observed GARCIA-GOMEZ count all the money.

26.   After all the money was counted and while CS2 was
conversing with GARCIA-GOMEZ, a dark-colored Grand Jeep Cherokee
bearing California license plate 8UCD595 (R/O at 824 Merwin
Street, Los Angeles, CA 90026) arrived in the parking lot driven
by an unidentified Hispanic male who exited the vehicle.  The
Hispanic male was later identified as MERCADO.

27.   At approximately 12:38 p.m. surveillance observed
MERCADO exit his vehicle carrying a black t-shirt with content
wrapped inside.  MERCADO was then observed approaching the
driver's side of the gray Mercedes where he handed the black t-
shirt with the contents wrapped inside to GARCIA-GOMEZ.  GARCIA-
GOMEZ received the black t-shirt and then handed it to CS2.  CS2
gave GARCIA-GOMEZ $4000 in exchange for the suspected fentanyl
pills.

28.   At approximately 12:40 p.m. CS2 briefly conversed with
MERCADO and asked "Hey you were here huh?" to which MERCADO
replied "yeah."

29.   At approximately 12:45 p.m. CS2 placed the suspected
fentanyl pills inside of their vehicle, and MERCADO and GARCIA-
GOMEZ left the Vons grocery store parking lot in their respective
vehicles.

30.   At approximately 12:50 p.m. surveillance observed
MERCADO travel to 824 Merwin Street and park his car.

31.   A short time later, SA Thomas called LA Clear, a
deconfliction call center, to give them the 824 Merwin Street

address.  A DEA agent contacted SA Thomas and informed her that they arrested a male at a storage facility who was associated with this address a few months prior.  The agent also let SA Thomas know that a subject by the name of Jonathan MERCADO was also at the storage facility with their subject.  The agent sent SA Thomas a picture of MERCADO.  The picture confirmed that MERCADO was the Hispanic male who delivered the suspected fentanyl to GARCIA-GOMEZ on April 20, 2022 and who GARCIA-GOMEZ met with during the first buy/walk operation.  MERCADO was driving a black Mercedes on the day his associate was arrested, with CA license plate 8YIW058, registered to the address of 12056 Peach Street, Lynwood, CA.

**F.   May 5, 2022: GARCIA-GOMEZ Sells CS2 3,000 fentanyl pills for $6,000**

32.   On May 4, 2022, and prior to that date, at the direction of myself and Thomas and on a recorded line, CS1 was in telephone conversations with GARCIA-GOMEZ at the 5299 number. GARCIA-GOMEZ negotiated the purchase of 3,000 fentanyl pills and two pounds of methamphetamine for $8,200.

33.   On May 5, 2022, myself and SA Thomas met CS2 at a neutral location.  CS2 was present at the narcotics transaction on behalf of CS1 as a courier to meet with GARCIA-GOMEZ.  CS2 was outfitted with an audio/video transmitter/recorder device.

34.   On May 5, 2022 at approximately 6:55 a.m., law enforcement officers set up surveillance at 824 Merwin Street and 12056 Peach Street, Apt C, Lynwood, CA 90262.

35.  At approximately 6:55 a.m., FPD confirmed that the black Jeep, with CA plate 8UCD595, was parked on Merwin Street.

36.  At approximately 7:14 a.m., surveillance officers observed a black Mercedes, with CA plate 8YIW058, parked on 12056 Peach Street.

37.  At approximately 8:52 a.m., officers observed the black Mercedes and a dark blue Nissan sedan, registered to L.D. in Los Angeles, departing 12056 Peach Street.  Officers saw the two vehicles driving in tandem and driving erratically near a school zone.  Surveillance was terminated on both vehicles.

38.  At approximately 9:30 a.m., agents set up surveillance at a Vons, located at 1342 Alvarado Street Los Angeles, CA 90026. Shortly after, CS2 was escorted from the neutral location to the parking lot of the Vons grocery store located at 1342 N Alvarado Street Los Angeles, CA 90026.

39.  At approximately 10:00 a.m., on a recorded line, CS1 notified GARCIA-GOMEZ that CS2 had arrived and was waiting on her.

40.  At approximately 10:13 a.m., FPD observed an unidentified male enter the black Jeep that was parked at 824 Merwin Street.  A few moments later, FPD observed the male park the Jeep in front of 824 Merwin Street and walk inside of 824 Merwin Street.

41.   At approximately 10:27 a.m., SA Aaron Johnson observed a gray Mercedes Benz park next to CS2's vehicle.  Agents identified GARCIA-GOMEZ as the driver of the Mercedes.

42.   A few moments later, surveillance observed the black Jeep from Merwin Street park on Liberty Street.  A/GS Flanigan departed the area and when he came back around to park in the same parking spot, he observed that it was the same black Jeep that was parked at 824 Merwin Street earlier that day.

43.   At approximately 10:40 a.m., SA Aaron Johnson observed an unidentified male walking towards CS2 and GARCIA-GOMEZ's vehicle.  A short time later, the male handed a bag to GARCIA-GOMEZ that contained the suspected fentanyl pills.  GARCIA-GOMEZ handed the bag to CS2.  A few moments later, CS2 called SA Thomas to inform her that the bag contained the suspected fentanyl pills.

44.   A few moments later, FPD observed the unidentified male enter the black Jeep.  Officers conducted surveillance on the Jeep as it departed the Vons.  A short time later, the Jeep pulled to the curb and surveillance was lost on the vehicle.

45.   At approximately 10:43 a.m., CS2 informed SA Thomas that GARCIA-GOMEZ was expecting an individual to deliver the two pounds of methamphetamine in approximately seven minutes.

46.    At approximately 10:57 a.m., officers observed the black Mercedes Benz and blue Nissan that departed 12056 Peach Street earlier that day parked near 824 Merwin Street.

47.    At approximately 11:03 a.m., officers observed the Mercedes Benz and blue Nissan depart 824 Merwin Street and drive in tandem.  A few moments later, officers terminated surveillance on both vehicles as it appeared they were doing counter surveillance.

48.    At approximately 11:19 a.m., GARCIA-GOMEZ informed CS2 that the methamphetamine supplier was not going to deliver the methamphetamine.

49.    A short time later, GARCIA-GOMEZ departed the Vons parking lot.

50.    At approximately 12:00 p.m., CS1 contacted me and informed me that he/she spoke to GARCIA-GOMEZ, and was negotiating a deal to sell CS2 an additional 1,000 fentanyl pills on the same day.  CS1 let GARCIA-GOMEZ know that the deal would happen at a later date.

### G.    May 25, 2022: GARCIA-GOMEZ and MERCADO Attempt to Sell 50,000 fentanyl pills for $125,000

51.    On or around May 17, 2022, at the direction of myself and SA Thomas and on a recorded line, CS1 was in telephone conversations with GARCIA-GOMEZ at the 5299 number.  GARCIA-GOMEZ negotiated the purchase of 50,000 fentanyl pills for $125,000. GARCIA-GOMEZ, on a recorded line, told CS1 that her old supplier

was not able to supply the fentanyl pills.  GARCIA-GOMEZ told CS1 that it would be a new supplier, selling the pills at $2.50, and texted CS1 the address to conduct the meet: 3160 E Imperial Hwy, Lynwood, CA 90262.

52.   On May 25, 2022, at approximately 11:00 a.m., CS2, along with DEA Special Agents and South Gate Police Department detectives ("SGD") met at a neutral location, before traveling to Walmart, located at 2100 N Long Beach Blvd, Compton, CA 90221. CS2 was equipped with an audio recording and transmitting device.

53.   At approximately 11:30 a.m., SGD set up surveillance at 12056 Peach Street, Lynwood, CA, where MERCADO's Mercedes is registered.

54.   A short time later, SGD saw a Black Honda, 8UJA923, registered to GARCIA-GOMEZ, parked in front of 12056 Peach Street.  A few moments later, SGD observed the Honda go the rear of the driveway, out of sight.

55.   A short time later, SGD observed the Honda and the Mercedes depart 12056 Peach Street in tandem.

56.   At approximately 12:26 p.m., SGD observed the Honda and Mercedes enter Extra Space Storage, (where the SUBJECT PREMISES is located), located at 157 E Stanley St, Compton, CA 90220.  Surveillance was lost on the vehicles at this time.

57.   At approximately 12:30 p.m., the Honda and Mercedes departed the storage facility where the SUBJECT PREMISES is located and drove back to 12056 Peach Street.

58.   At approximately 1:00 p.m., SGD observed GARCIA-GOMEZ give a small package to an unidentified male who was riding a bike.  The unidentified male departed this location and surveillance was terminated on the bicycle.

59.   At approximately 1:00 p.m., driving a big rig, CS2 followed SA LaShay Thomas and myself, to Walmart, the agreed-upon meet location.  At around this same time, CS1 was talking to GARCIA-GOMEZ on a recorded line letting her know that CS2 is around the area.

60.   At approximately 1:07 p.m., SGD observed GARCIA-GOMEZ and MERCADO washing their vehicles.

61.   At approximately 1:38 p.m., SGD observed GARCIA-GOMEZ enter the Honda and MERCADO enter the Mercedes.

62.   At approximately 1:50 p.m., SGD observed the Honda and Mercedes park at Super A Market, located at 8116 California Ave E, South Gate, CA 90280.

63.   A short time later, CS1, on a recorded line, spoke to GARCIA-GOMEZ and passed her the Walmart address.

64.   At around this time, SGD observed MERCADO give a bag to an unidentified male driving a Dodge Charger, CA 8JIU324.

65.   A short time later, SGD observed the Honda and Mercedes depart from Super A Market, driving in tandem.

66.   At approximately 2:10 p.m., SGD observed the Honda and Mercedes arrive at E Pine Street and Long Beach Blvd, across the street from the Walmart location.

67.   At this time, SGD observed MERCADO park on E Pine Street and exit the Mercedes and walk towards GARCIA-GOMEZ's

Honda.  SGD observed MERCADO pulling out a bookbag from the Honda and putting the bag inside of MERCADO's Mercedes.

68.  A short time later, SGD observed the Honda drive to the Walmart location.

69.  A few moments later, the Honda parked next to CS2 and GARCIA-GOMEZ, who was in the Honda started talking to CS2.

70.  SA Thomas and myself was listening to the recording device CS2 had in hand.  GARCIA-GOMEZ told CS2 that she would bring out 10,000 at a time.  CS2 let GARCIA-GOMEZ know that the money was not separated and that CS2 was not able to separate it.

71.  A few moments later, Agents observed GARCIA-GOMEZ depart the Walmart location and drive to E Pine Street.  GARCIA-GOMEZ parked on E Pine Street.

72.  A short time later, GARCIA-GOMEZ, on a recorded line, spoke to CS1.  CS1 advised her to bring out the pills and that CS2 had the money.

73.  A short time later, officers detained GARCIA-GOMEZ and searched the Honda and the Mercedes on E Pine Street.  Officers saw that MERCADO was no longer in the Mercedes and had left the scene.  Officers observed a bookbag on the passenger side floor of the Mercedes containing a large number of suspected fentanyl pills.

74.  SGD stated that they spoke to an employee of the storage facility where GARCIA-GOMEZ and MERCADO had gone before the deal.  The employee stated GARCIA-GOMEZ rents out the SUBJECT PREMISES and is always late on her payments.  The employee stated that GARCIA-GOMEZ tried to get access to the SUBJECT PREMISES at

approximately 12:30 p.m. on May 25, 2022.  However, the employee changed the combination code and told GARCIA-GOMEZ they will not give her access to enter the unit.  GARCIA-GOMEZ told the employee that she would pay them more money for them to open the unit.  The employee declined.  The employee also stated that they observed empty acetone bottles near the storage unit.  Based on my training and experience, acetone is widely used in the making of crystal methamphetamine.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

75.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

76.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

77.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

78.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Maria GARCIA-GOMEZ and Jonathan Alexis MERCADO's thumb and/or fingers on the device(s); and (2) hold the devices in front of Maria GARCIA-GOMEZ and Jonathan Alexis MERCADO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

79.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

## VII. <u>CONCLUSION</u>

80.   For all of the reasons described above, there is probable cause to believe that Maria GARCIA-GOMEZ and Jonathan Alexis MERCADO have committed a violation of 21 U.S.C. § 841(a)(1): distribution of a controlled substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 26th day of
May      , 2022.

_____
HON. PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE